# 11-1311

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

EDWARD SCHNABEL, LUCY SCHNABEL, and BRIAN SCHNABEL,
On Behalf Of Themselves And All Others Similarly Situated,

Plaintiffs-Appellees,

v.

TRILEGIANT CORPORATION and AFFINION, INC,

Defendants-Appellants.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

## BRIEF OF PLAINTIFFS-APPELLEES EDWARD SCHNABEL, LUCY SCHNABEL AND BRIAN SCHNABEL

James C. Shah
Nathan C. Zipperian
SHEPHERD, FINKELMAN,
MILLER & SHAH, LLP
35 E. State Street
Media, PA 19063
Telephone: (610) 891-9880
Facsimile: (610) 891-9883

James E. Miller
Patrick A. Klingman
SHEPHERD, FINKELMAN,
MILLER & SHAH, LLP
65 Main Street
Chester, CT 06412
Telephone: (860) 526-1100
Facsimile (860) 526-1120

*Counsel for Plaintiffs-Appellees*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW . . . . . . . . . . . . 3

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    A.    Plaintiffs Did Not Enroll In The Great Fun Program . . . . . . . . . . . . 9

    B.    Plaintiffs Never Agreed To An Arbitration Agreement . . . . . . . . . 13

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    I.    THE DISTRICT COURT CORRECTLY FOUND THAT
        THERE WAS NO AGREEMENT TO ARBITRATE . . . . . . . . . . 20

        A.    The Federal Arbitration Act Does Not Apply . . . . . . . . . . . 20

        B.    There Was No Agreement To Arbitrate Between
            The Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

            1.    The Arbitration Agreement In Question Does
                Not Relate To Plaintiffs' Claims . . . . . . . . . . . . . . . 21

            2.    Standard For Determining The Existence Of An
                Agreement To Arbitrate . . . . . . . . . . . . . . . . . . . . . . 23

3.      The Schnabels Never Assented To The Great Fun
        Program Membership Terms . . . . . . . . . . . . . . . . . . . .   26

4.      The Schnabels' Continued Membership In Great
        Fun And Payment Of Membership Fees Are
        Patently Insufficient To Show Assent To Be
        Bound By Any Arbitration Provision . . . . . . . . . . . .   33

5.      Whether The Membership Terms Were
        Provided Before Or After Enrollment Is
        Inconsequential To The Existence Of A Valid
        Arbitration Agreement. . . . . . . . . . . . . . . . . . . . . . .   41

II.     LUCY SCHNABEL'S CLAIMS ARE NOT SUBJECT TO
        ARBITRATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   43

III.    PLAINTIFFS' CLAIMS AGAINST AFFINION ARE NOT
        SUBJECT TO ARBITRATION  . . . . . . . . . . . . . . . . . . . . . . . .   44

IV.     THERE IS NO EVIDENCE THAT THE PARTIES AGREED
        TO AUTHORIZE ARBITRATION AT ALL, LET ALONE
        CLASSWIDE ARBITRATION . . . . . . . . . . . . . . . . . . . . . . . .   45

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   46

# TABLE OF AUTHORITIES

## FEDERAL AND STATE CASES

*American Boat Co., Inc. v. Unknown Sunken Barge*,
 418 F.3d 910 (8th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*AT&T Mobility LLC v. Concepcion*,
 131 S.Ct. 1740 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Bank One, N.A. v. Coates,*
 125 F.Supp.2d 819 (S.D. Miss. 2001),
 *aff'd*, 34 Fed.Appx. 964 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Bell v. Cendant Corp.*,
 293 F.3d 563 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Bensadoun v. Jobe-Riat*,
 316 F.3d 171 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Binder v. Aetna Life Ins. Co.*,
 75 Cal.App.4th 832 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Burcham v. Expedia, Inc.*,
 No. 07-cv-1963 CDP, 2009 WL 586513 (E.D. Mo. Mar. 6, 2009) . . . . . . . . . . 43

*Cameron v. Avonridge, Inc.*,
 3 Conn.App. 230 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*,
 58 F.3d 16 (2d Cir.1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Dart Mechanical Corp. v. XL Specialty Ins.*,
 593 F.Supp.2d 464 (E.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27-28

*Duplissie v. Devino,*
 96 Conn.App. 673, *cert. denied*, 280 Conn. 916 (2006) . . . . . . . . . . . . . . . . . . 25

*Dzanoucakis v. Chase Manhattan Bank, USA*,
  No. 06-cv-5673 (JFB/ARL), 2009 WL 910691 (E.D.N.Y. Mar. 31, 2009) . . . . 31

*Electrical Wholesalers, Inc. v. M.J.B. Corp.*,
  99 Conn.App. 294 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*First Options of Chicago, Inc. v. Kaplan*,
  514 U.S. 938 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Fisser v. International Bank*,
  282 F.2d 231 (2d Cir. 1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Granite Rock Co. v. Internat'l Brotherhood of Teamsters*,
  130 S.Ct. 2847 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Hardy v. Cendant Corp.*,
  No. 04-15403 (11th Cir., Aug. 3, 2005) (unpublished) . . . . . . . . . . . . . . . . . . . 40

*Harry Skolnick and Sons v. Heyman*,
  7 Conn.App. 175, *cert. denied*, 200 Conn. 803 (1986) . . . . . . . . . . . . . . . . . 22, 34

*Hines v. Overstock.com, Inc.*,
  380 Fed.Appx. 22, 2010 WL 2203030 (2d Cir. June 3, 2010) . . . . . . . . . . . . . 23

*Hines v. Overstock.com, Inc.*,
  668 F.Supp.2d 362 (E.D.N.Y. 2009),
  *aff'd*, 380 Fed.Appx. 22 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 29

*L&R Realty v. Connecticut National Bank*,
  246 Conn. 1 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Laouini v. CLM Freight Lines, Inc.*,
  586 F.3d 473 (7th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Kurz v. Chase Manhattan Bank USA, N.A.*,
  319 F.Supp.2d 457 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 39

*M.J. Daly & Sons, Inc. v. City of West Haven*,
  66 Conn.App. 41, *cert. denied*, 258 Conn. 944 (2001) . . . . . . . . . . . . . . . . . . . . 25

*Marinos v. Building Rehabilitations, LLC*,
  67 Conn.App. 86 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Memberworks, Inc. v. Yance*,
  899 So.2d 940 (Ala. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37-38, 39

*Milligan v. Comcast Corp.*,
  No. 06-cv-00809-UWC, 2007 WL 4885492 (N.D. Ala. Jan. 22, 2007) . . . . . . . 39

*Novak v. Overture Svcs., Inc.*,
  309 F.Supp.2d 446 (E.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Olson v. The Bon, Inc.*,
  144 Wash.App. 627 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 34-35

*Oppenheimer & Co., Inc. v. Neidhardt*,
  56 F.3d 352 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24, 32

*Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., Ltd.*,
  636 F.2d 51 (3d Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Precision Mechanical Services, Inc v. Shelton Yacht & Cabana Club, Inc.*,
  97 Conn.App. 258, *cert. denied*, 280 Conn. 928 (2006) . . . . . . . . . . . . . . . . . . . 25

*ProCD, Inc. v. Zeidenberg*,
  86 F.3d 1447 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela*,
  991 F.2d 42 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Rosenblit v. Laschever*,
  115 Conn.App. 282 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Scherillo v. Dun & Bradstreet, Inc.,*
 684 F.Supp.2d 313 (E.D.N.Y. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Shann v. Dunk,*
 84 F.3d 73 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Shaw Group Inc. v. Triplefine Intern. Corp.,*
 322 F.3d 115 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Specht v. Netscape Communications Corp.,*
 306 F.3d 17 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*SSI Med. Servs., Inc. v. State Dep't of Human Servs.,*
 685 A.2d 1 (N.J. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Ubysz v. DiPietro,*
 185 Conn. 47 (Conn. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Van Tassell v. United Marketing Group, LLC,*
 No. 10 C 2675, 2011 WL 2632727 (N.D. Ill. July 5, 2011) . . . . . . . . . . . . . . . 27

*Walters v. Chase Manhattan Bank,*
 CV-07-0037-FVS, 2008 WL 3200739 (E.D. Wash. Aug. 6, 2008) . . . . . . . . . . 39

*Weddington Productions, Inc. v. Flick,*
 60 Cal.App.4th 793 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Wesleyan University v. Rissil Construction Associates, Inc.,*
 1 Conn.App. 351, *cert. denied*, 193 Conn. 802 (1984) . . . . . . . . . . . . . . . . . . 22

## FEDERAL AND STATE STATUTES

9 U.S.C. § 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

9 U.S.C. § 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21, 23

9 U.S.C. § 16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 1962 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4

18 U.S.C. § 2510 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1332 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1367 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Cal. Civ. Code § 1750 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Cal. Bus. & Prof. Code § 17200 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Cal. Bus. & Prof. Code § 17500 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Conn. Gen Stat. Ann. § 42-110(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

# STATEMENT OF JURISDICTION

The United States District Court for the District of Connecticut (the "District Court") has subject matter jurisdiction over the putative class action of Plaintiffs-Appellees, Edward Schnabel ("Edward"), Lucy Schnabel ("Lucy"), and Brian Schnabel ("Brian") (collectively, "Plaintiffs" or the "Schnabels"), pursuant to 28 U.S.C. § 1331, because the District Court action arises under the laws of the United States, specifically the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, and the Electronic Communications Privacy Act, 18 U.S.C. §2510 *et seq*. The District Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367. The District Court also has jurisdiction pursuant to 28 U.S.C. § 1332(d), because the amount in controversy in this putative class action exceeds $5 million, exclusive of costs and interest, and at least one member of each putative class is a citizen of a state different from Defendants-Appellants, Trilegiant Corporation ("Trilegiant") and Affinion Group, LLC ("Affinion") (collectively, "Defendants").

Defendants appeal from an interlocutory order denying their Motion to Dismiss or Stay and Compel Arbitration. This Court has jurisdiction over this appeal pursuant to Section 16 of the Federal Arbitration Act because this is an appeal from an order "refusing a stay of any action." 9 U.S.C. § 16(a)(1)(A).

Defendants' appeal was timely pursuant to Fed. R. App. P. 4(a)(1). The District Court's Order denying Defendants' Motion to Dismiss or Stay and Compel Arbitration was entered on Thursday, February 24, 2011. Defendants filed their Notice of Appeal on Monday, March 28, 2011.

## <u>STATEMENT OF THE ISSUES PRESENTED FOR REVIEW</u>

(1)  Absent evidence that Plaintiffs assented to, let alone were aware of, the terms and conditions of a purported contract with Defendants, did the District Court err in concluding that there was no contract formed between them?

(2)  Absent evidence that Plaintiffs assented to, let alone were aware of, an arbitration provision proffered by Defendants, did the District Court err in concluding that Plaintiffs were not bound by the arbitration provision?

## STATEMENT OF THE CASE

This action was commenced on June 17, 2010, when the Schnabels filed their Class Action Complaint (the "Complaint") (Joint Appendix ("App.") 16-49) in the District of Connecticut, where it was assigned to the Honorable Janet C. Hall.  The Complaint alleges, on behalf of a proposed nationwide class, that Defendants violated the Connecticut Unfair Trade Practices Act ("CUTPA") (Conn. Gen Stat. Ann. § 42-110(a) *et seq*.), RICO (18 U.S.C. § 1962), the Electronic Communications Privacy Act (18 U.S.C. § 2510 *et seq*.), and were unjustly enriched by marketing and selling their membership programs in a fraudulent and deceptive manner.  The Complaint also alleges, on behalf of a proposed class of California consumers, violations by Defendants of California's Consumer Legal Remedies Act (Cal. Civ. Code § 1750 *et seq*.), its False Advertising Law (Cal. Bus. & Prof. Code § 17500 *et seq*.), and its Unfair Competition Law (Cal. Bus. & Prof. Code § 17200 *et seq*.).

On September 29, 2010, Defendants filed their Motion to Dismiss or Stay and Compel Arbitration ("Motion"), based upon Defendants' assertion that, despite Plaintiffs clearly having no knowledge or intention of entering into an agreement with Defendants, they should, nonetheless, be bound by an arbitration provision contained in the agreement, which they also never saw nor to which they

consented.  On October 19, 2010, the Schnabels filed their Opposition to the Motion.  Plaintiffs demonstrated therein that they never entered into any agreement with Defendants, let alone an arbitration agreement, and that any payments made to Defendants were the result of Defendants' deceptive practices and not a manifestation of any intent on Plaintiffs' part to enter into an agreement.

On February 24, 2011, the District Court entered an Order denying the Motion in its entirety (the "Ruling") (App. 3-15).  The District Court held that, even assuming the facts as presented by Defendants, the Schnabels did not, as a matter of law, enter into an arbitration agreement with Defendants.

Defendants timely filed their notice of appeal from the District Court's Ruling on March 28, 2011.  (App. 1).

## STATEMENT OF FACTS

Trilegiant, as a subsidiary, division, operational department, and/or agent of Affinion, is in the business of marketing and selling purported membership programs for goods and services ("Membership Programs").  These Membership Programs claim to  provide consumers the opportunity to obtain information and/or discounts on various goods and services for a periodic "membership fee," ranging from $8.99 monthly to $480.00 annually.  Defendants assess this "membership fee" against consumers' credit, debit, or other accounts on a monthly, bi-monthly, semi-annual, and/or annual basis.  (Joint Appendix ("App.") 17-18, 24-25; ¶¶ 2, 22).

As the use of the Internet as a means to make purchases has grown, consumers, such as Plaintiffs, have been subjected to online-based schemes and devious activities, such as "cramming" and "data passing."  The former refers to the practice of imposing unauthorized charges on the billing statements of unwitting consumers, while "data passing" refers to the practice of automatically and unilaterally transferring the credit or debit card information of consumers from an online merchant to an unfamiliar third party for the purpose of enrolling and charging unsuspecting consumers "membership fees" for membership into a club belonging to the third party.  (App. 18, 24; ¶¶ 4, 21).

In connection with Defendants' Membership Programs and to further the marketing and sales efforts related thereto, Defendants enter into agreements with financial institutions, retailers, telephone service providers, car rental companies, mortgage lenders, hotels, cable companies, and Internet service providers -- many of whom are Fortune 500 companies -- including, *inter alia*, 1-800-Flowers.com, AirTran Airways, Priceline.com, Avon, Hotwire.com, and Classmates.com. A significant part of these partner companies' business is devoted to e-commerce. (App. 25; ¶ 24).

Pursuant to the marketing and sales agreements entered into between Defendants and these e-commerce merchants, Defendants obtain personal identifying, financial, and billing information about the e-commerce merchants' customers in exchange for valuable compensation. Defendants then use this private consumer information to market, sell, and charge consumers for Defendants' Membership Programs. Defendants routinely add the partner merchant's name to Defendants' marketing materials, solicitations, and charges, giving the false, deceptive, and/or misleading appearance that a Membership Program is sponsored, marketed, sold, or charged by the partner, when in fact it is not. (App. 25–26; ¶ 25). Using the personal identifying and financial information obtained from partner merchants, Defendants also use standardized telemarketing,

Internet advertising, and other solicitation techniques to urge consumers to accept Defendants' offers for "free" trial memberships. (App. 26-27; ¶ 27).

On or about September 21, 2009, Edward and Lucy's joint United Mileage Plus credit card was charged $14.99 by Trilegiant. The transaction description for that charge, and five subsequent and identical monthly charges, was "TLG*GREATFN89718058 877-709-0966 CT." Edward did not initially notice the charges. The final charge, also of $14.99, occurred on February 19, 2010. Edward noticed the recurring charge for the first time on or about March 9, 2010, and contacted Defendants to request that they stop the charges. Until that time, Edward had no knowledge why Trilegiant was charging his credit card. Edward did not know what Trilegiant was, or what services or goods it claimed to provide. In fact, Edward did not remember ever hearing the name Trilegiant, before noticing the charges and investigating their source. At no time did Edward knowingly provide consent for his credit card to be used for enrollment in any of Defendants' membership programs. Despite repeated requests for a full refund, Defendants refused to refund two of the six months for which Edward and Lucy were unlawfully charged. (App. 21-22; ¶ 13).

On or about December 20, 2007, Brian's CitiDiamond Preferred credit card was first charged $11.99 by Trilegiant. The transaction description for that

charge, and for 30 subsequent and identical monthly charges, was "TLG*GREATFN54169658." The final charge occurred on May 21, 2010. Brian noticed the recurring charge for the first time in March, 2010 and contacted Defendants shortly thereafter to try to stop the charges. At that time, he was told that he had "signed up" through a Priceline.com transaction. At no time did Brian provide his consent for his credit card to be used for enrollment in any of Defendants' membership programs. Further, Brian never received any confirmation or membership materials related to his purported membership. After speaking with Defendants' representatives, Brian was promised reimbursement for only four of the 30 months for which he was charged by Defendants. (App. 22; ¶ 14).

## A. Plaintiffs Did Not Enroll In The Great Fun Program

Despite Defendants' assertions, Edward and Brian did not enroll in the Great Fun Membership Program by affirmatively responding to an offer in an Internet banner advertisement. As alleged in Plaintiffs' Complaint, Defendants' business model is based upon deception, cramming and the use of data passing. As the United States Senate Committee on Commerce, Science, and Transportation concluded in its November 16, 1999 Staff Report, Defendants "use aggressive sales tactics intentionally designed to mislead online shoppers," and

that use of these tactics "exploits shoppers' expectations about the online purchasing process to charge millions of consumers each year for services the consumers do not want and do not understand they have purchased." (App. 17-18; ¶ 3). It was through these means that Defendants obtained the information they used to "enroll" Plaintiffs in the Great Fun Membership Program ("Great Fun program").

After reviewing the Memorandum of Law in Support of Defendants' Motion ("Memorandum"), Edward recalled making a purchase from Beckett.com and, for the first time, realized how Defendants obtained the information necessary to charge his credit card. (App. 69-70; ¶ 4). Edward entered his personal information, including his credit card information, address, telephone number and email address, to purchase baseball memorabilia from Beckett.com. (*Id.*) He further recalls seeing an advertisement for $20 cash back on the confirmation page of his purchase from Beckett.com. (*Id.*) Edward does not recall seeing anything about the Great Fun program at the time of purchase. (*Id.*) After clicking on the solicitation, and still believing he was on the Beckett.com website, Edward was asked for his city of birth, which he entered as New Britain. He was not prompted for, nor did he enter, a password, a user name, or his credit card information. (*Id.*) After entering only his place of birth, which did not include any payment

information, Edward decided that he was not interested in the solicitation. (*Id.*) Contrary to the web pages collected at Exhibit A (App. 59-61) to the September 29, 2010 Affidavit of Kristin J. Mallozzi in support of Defendants' Motion ("Mallozzi Aff.") (App. 52-68), which are undated and not even alleged to be the webpage viewed by Edward, but rather a solicitation that is, according to Defendants, "substantially the same as the solicitation that was made to Edward," (App. 53; Mallozzi Aff., ¶ 6), Edward does not recall seeing a ready means of opting out of the transaction. (App. 69-70; ¶ 4). As a result, Edward simply closed the webpage he was viewing. He never received a "confirmation page," (*Id.*), which is attached as the third page of Exhibit A to the Mallozzi Aff. (App. 61). Even if Exhibit A (App. 59-61) was an accurate representation of the web pages viewed by Edward at the time of his "enrollment" -- and there is absolutely no evidence that it is -- there is no mention of an arbitration agreement in any of the those documents. Clearly, Edward never intended to enter into any agreement with Defendants, never enrolled in the Great Fun program, and certainly never intended to submit any claims that might arise from such a contract to arbitration excluding classwide relief. (App. 71; ¶ 11).

Similar to Edward, Brian had no idea how he had been enrolled in the Great Fun program until he began investigating the charges that appeared on his credit

card.  (App. 76-77; ¶¶ 3, 4).  After contacting Defendants, Brian was told that he "signed up" in conjunction with a Priceline.com transaction.  (App. 77; ¶ 5).  Brian recalled making a purchase from Priceline.com, but did not recall providing any information to a third party, and after attempting to have all of the charges reversed, brought this suit.  (App. 77; ¶ 7).  After reviewing Defendants' Memorandum, Brian realized how Defendants had obtained his information.  In conjunction with his purchase from Priceline.com, Brian entered his personal information, including his credit card information, address and email address. (App. 77; ¶ 8).  Brian further recalls seeing an offer in a small pop up for 20 percent off his purchase from Priceline.com.  (App. 77; ¶ 9).  Brian does not recall seeing anything about the Great Fun program at that, or any other, time.  (*Id*.) After clicking on the offer, Brian entered his email address.  He was not prompted for, nor did he enter, a password, a user name, his telephone number or his credit card information.  (*Id*.)  After entering his email address, which did not include any payment information, Brian decided that he was not interested in the solicitation.  (App. 77-78; ¶ 10).  Contrary to the web pages collected as Exhibit C to the Mallozzi Aff. (App. 63-64), which are undated and not even alleged to be the web pages actually viewed by Brian but rather a solicitation that is, according to Defendants, "substantially the same as the solicitation that was made to Brian,"

(App. 54-55; Mallozzi Aff., ¶ 10), Brian does not recall seeing a means of opting out of the transaction. As a result, Brian simply closed the web page he was viewing. (App. 77-78; ¶ 10). Moreover, Brian does not recall seeing any web pages substantially similar to Exhibit C. (App. 71; ¶ 11). Even if Exhibit C is an accurate representation of the web pages viewed by Brian at the time of his "enrollment," there is no mention of an arbitration agreement in any of the those pages. Clearly, Brian never intended to enter into any agreement with Defendants, never affirmatively enrolled in the Great Fun program, and certainly never intended that any claims he might have arising from a contract he did not enter into would be resolved by arbitration precluding classwide relief. (App. 71; ¶ 16).

## B. Plaintiffs Never Agreed To An Arbitration Agreement

Defendants assert that it is their routine practice and procedure to send the terms and conditions of the Great Fun program to consumers who "enroll" online. Despite this assertion, however, Defendants have failed to provide any evidence that they actually e-mailed or mailed anything to Plaintiffs. The email upon which Defendants rely was not sent to Edward or Brian, but to Daniel Eid, apparently an employee of Defendants (judging by the email address), on December 19, 2008. (App. 66-68). For some reason, Defendants have failed to provide the Court with copies of the emails that they allegedly sent to Brian or Edward, despite the

assertion that Defendants keep records of such emailings in "the ordinary course of business." (App. 56; Mallozzi Aff., ¶ 14). In addition, they have failed to prove that any materials were ever mailed to Brian or Edward, despite the reference in the "Great Fun Membership Terms & Conditions" to a "GF membership card" and the assertion in the December 19, 2008 email to Daniel Eid that *he* should "watch for [his] membership materials arriving soon by mail..." (App. 59 - 61; Ex. E to Mallozzi Aff.). Glaringly absent from the evidence presented by Defendants are copies of the documents allegedly mailed to Edward and Brian. Nor do Defendants present any evidence or testimony that anything was mailed to Brian or Edward, beyond the unsubstantiated claim that it was Trilegiant's routine and practice to do so.

Despite Defendants' glaring omissions, it appears that some emails were sent to Edward, though there is no evidence that any emails were ever sent to Brian. (App. 70-71, 72-75; ¶¶ 7-8; App. 78; ¶¶ 14-15). After reviewing Defendants' Memorandum, Edward reviewed his old email and, to his surprise, discovered that he had received, but ignored, several emails from service@greatfunsite.com. He had not previously noticed the emails and had not read them because he assumed that they were directed to his wife, Lucy, or were spam emails, as he had no knowledge of the sender, Great Fun. Although one of

the emails contains the "Great Fun Membership Terms & Conditions" and references a "GF membership card," Edward never viewed this email and never assented to the agreement contained therein. (App. 70-71; ¶¶ 7, 8). At no time did Edward receive anything in the mail from Defendants, including a GF membership card or welcome materials. (App. 71; ¶ 9).

Following his review of Defendants' Memorandum, Brian also conducted a thorough search of his email and re-affirmed that he never received any emails from Defendants. (App. 78; ¶ 14). Like Edward, he also never received any materials via regular mail from Defendants. Neither Edward nor Brian ever knowingly and/or affirmatively assented to enter into a relationship with Defendants. (App. 71; ¶ 11; App. 78; ¶ 16). They also never received any benefit from the purported relationship and were unaware that Defendants had, through deceptive means, obtained their credit card information and were charging them for a "service" that they did not want and had not agreed to purchase. (App. 71; ¶ 9; App. 71; ¶ 13).

Because they never entered into any contract or relationship with Defendants, let alone entered into an arbitration agreement, Plaintiffs were not required to file their action in small claims court or make an arbitration demand, as Defendants suggest. Defendants' assertion that Plaintiffs are somehow bound by

an arbitration agreement that they never saw for a product or service they did not want and never received, let alone understood and agreed to, is without any support in the law and is, quite frankly, absurd.

## STANDARD OF REVIEW

The District Court's denial of a motion to compel arbitration is subject to *de novo* review. *See Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 19 (2d Cir.1995). "The determination of whether parties have contractually bound themselves to arbitrate a dispute [is] a determination involving interpretation of state law [and, hence] a legal conclusion also subject to *de novo* review." *Specht v. Netscape Communications Corp.*, 306 F.3d 17, 26 (2d Cir.2002); *accord Shann v. Dunk*, 84 F.3d 73, 77 (2d Cir.1996). However, where "[t]he findings upon which that conclusion is based ... are factual[, they] may not be overturned unless clearly erroneous." *Specht*, 306 F.3d at 26.

# SUMMARY OF ARGUMENT

The District Court correctly denied Defendants' Motion. Simply put, as the District Court recognized, Plaintiffs never entered into an arbitration agreement with Defendants. The District Court held that "no material issues of fact exist such that a reasonable jury could find that an agreement to arbitrate" was made between the parties, even if one assumes the facts as alleged by Defendants. February 24, 2011 Ruling (the "Ruling") at 6; App. 8. This is clearly true.

An agreement to arbitrate, like any contract, requires mutual assent. Defendants have presented no evidence of mutual assent here. First, the arbitration agreement which Defendants purport binds Plaintiffs does not, on its face, relate to Defendants but rather to an entity called "GF." In addition, Defendants have woefully failed to set forth any evidence that Plaintiffs assented to enter into any agreement with Defendants. In fact, the evidence leads inexorably to the opposite conclusion. Plaintiffs were unaware of any transaction with Defendants, received no benefits as a result of the alleged transaction, never received or reviewed the "terms and conditions" of any such agreement, and only continued to pay fees to Plaintiffs as a result of their confusion stemming from Defendants' deceptive practices.

As the District Court concluded, even if Plaintiffs had voluntarily enrolled

in Plaintiffs' membership program, knowingly paid their monthly fees and actually received emails detailing the terms and conditions of their "membership," there would still be no arbitration agreement between the parties. Although the evidence demonstrates that no contract was formed between the parties, any contract that was formed was done so before Plaintiffs ever saw the arbitration provision. Thus, the crux of Plaintiffs' argument, and the District Court's Ruling, is simple -- Plaintiffs cannot be bound by an agreement they never saw, let alone to which they never agreed. The District Court's Ruling, denying Defendants' Motion, should be affirmed.

# ARGUMENT

## I. THE DISTRICT COURT CORRECTLY FOUND THAT THERE WAS NO AGREEMENT TO ARBITRATE

### A. The Federal Arbitration Act Does Not Apply

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.* expressly provides that a "written provision" to arbitrate is an indispensable prerequisite to the statute's application. *See Fisser v. International Bank*, 282 F.2d 231, 233 (2d Cir. 1960) (describing "written provision" requirement as the "*sine qua non* of an enforceable arbitration agreement"); 9 U.S.C. § 4 (providing that "[i]f the making of the arbitration agreement ... [is] in issue, the court shall proceed summarily to the trial thereof," and the issue for the finder of fact at such a trial is whether there exists an "agreement in writing for arbitration ...."). Thus, requiring parties to arbitrate their claims is wholly improper absent an express, written agreement to arbitrate. *See Granite Rock Co. v. Internat'l Brotherhood of Teamsters*, 130 S.Ct. 2847, 2856 (2010) ("[A] court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate *that dispute*.") (citations omitted) (emphasis in original); *Shaw Group Inc. v. Triplefine Intern. Corp.*, 322 F.3d 115, 120 (2d Cir. 2003) ("[P]arties cannot be compelled to arbitrate issues that they have not specifically agreed to submit to arbitration.")

(citation omitted).

Here, the District Court properly made the threshold determination that "no material issues of fact exist such that a reasonable jury could find that an agreement to arbitrate has been made between the parties."  Ruling at 6 (App. 8). As the District Court aptly explained, "[N]o trial [pursuant to § 4 of the FAA] is necessary where the court can rule upon the existence of the arbitration agreement as a matter of law on the record before it."  *Id.* (citations and internal quotations omitted).  For the reasons set forth below, this Court should likewise find that no agreement to arbitrate exists.  Accordingly, the FAA does not apply to this case and all of Defendants' arguments relating to the FAA must fail.

**B.**     **There Was No Agreement To Arbitrate Between The Parties**

**1.**     **The Arbitration Agreement In Question Does Not Relate To Plaintiffs' Claims.**

This Court should begin and end its consideration of Defendants' challenge to the Ruling with an examination of the document Defendants refer to as the arbitration agreement, labeled the "Great Fun Membership Terms & Conditions" (the "Membership Terms"), attached as Exhibit E to the Mallozzi Aff.  (App. 66-68).  The Membership Terms, a document drafted entirely by Defendants and which Plaintiffs never even reviewed until this lawsuit was filed, states without

qualification that "[i]f there is any dispute between you and GF, either of us may elect to have it resolved by proceeding in small claims court or by binding arbitration administered by the National Arbitration Forum, or the American Arbitration Association, under their rules for consumer arbitrations." (App. 67, ¶ 5). GF is not a party to this action and there is no dispute between Plaintiffs and GF.

Under Connecticut law, "[a]rbitration agreements are strictly construed." *See Wesleyan University v. Rissil Construction Associates, Inc.*, 1 Conn.App. 351, 355, *cert. denied*, 193 Conn. 802 (1984). Further, "[a]n agreement to arbitrate must be clear and direct and not depend on implication." *See Harry Skolnick and Sons v. Heyman*, 7 Conn.App. 175, 179, *cert. denied*, 200 Conn. 803 (1986). Finally, where there is ambiguity, contractual terms must be construed against the drafter. *See Cameron v. Avonridge, Inc.*, 3 Conn.App. 230, 233 (1985). Here, Defendants drafted the Membership Terms. By its express language, the arbitration provision does not apply to disputes between consumers and Trilegiant, but rather disputes between consumers and GF. This action involves Plaintiffs' claims against Trilegiant, not GF. As a result, the arbitration agreement does not apply to this action and the District Court properly denied Defendants' Motion in its entirety.

### 2. Standard For Determining The Existence Of An Agreement To Arbitrate.

Even if the arbitration agreement in question somehow implicates the parties, which it does not, the District Court correctly found that Defendants had failed to make a "*prima facie* initial showing that an agreement to arbitrate existed." *See Hines v. Overstock.com, Inc.*, 380 Fed.Appx. 22, 2010 WL 2203030, at *1 (2d Cir. June 3, 2010). Such an initial showing is required to shift the burden "to the party opposing arbitration to put the making of [the agreement to arbitrate] 'in issue.'" *Id.*

Like a motion for summary judgment, Defendants' Motion required that they "substantiate [their] entitlement [to arbitration] by a showing of evidentiary facts" demonstrating that Plaintiffs agreed to arbitrate. *See Oppenheimer & Co., Inc. v. Neidhardt*, 56 F.3d 352, 358 (2d Cir. 1995); *Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela*, 991 F.2d 42, 46 (2d Cir. 1993) (imposing "preponderance of the evidence" burden on party seeking to show the existence of an agreement to arbitrate). "If there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary." *See Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003) (citing 9 U.S.C. § 4). Conversely, failure to present a genuine issue of fact negates the need for a trial. *See*

*Oppenheimer & Co.*, 56 F.3d at 358; *see also Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., Ltd.*, 636 F.2d 51, 54 (3d Cir. 1980) ("Only when there is no genuine issue of fact concerning the formation of the agreement should the court decide as a matter of law that the parties did or did not enter into such an agreement").

To determine whether an agreement to arbitrate is valid, state law contract principles apply. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (courts generally "apply ordinary state-law principles that govern the formation of contracts" in deciding "whether the parties agreed to arbitrate a certain matter") (citations omitted); *Bell v. Cendant Corp.*, 293 F.3d 563, 566 (2d Cir. 2002) ("Because an agreement to arbitrate is a creature of contract, [] the ultimate question of whether the parties agreed to arbitrate is determined by state law.").[1]

Under both Connecticut and California law, a "valid and binding" contract requires "mutual understanding of the terms that are definite and certain between

---

[1]Defendants suggest that the District Court failed to resolve a "potential choice of law issue." Opening Brief at 19. They are mistaken. In fact, noting that Defendants relied on a Connecticut choice of law provision, the District Court questioned how contract terms could bind a party where a court finds that the contract containing those terms never existed. Ruling at 5 (App. 7). Nonetheless, the District Court ultimately determined that its Ruling would be the same whether it applied under Connecticut or California law. *Id.* Defendants tellingly concede this point. Opening Brief at 19.

the parties ... to constitute an offer and acceptance sufficient to create an enforceable contract, each must be found to be based on an identical understanding by the parties." *See Duplissie v. Devino,* 96 Conn.App. 673, 688, *cert. denied*, 280 Conn. 916 (2006); *see also Binder v. Aetna Life Ins. Co.*, 75 Cal.App.4th 832, 850 (1999) ("To form a contract, a manifestation of mutual assent [by written or spoken words, or by conduct] is necessary") (citations omitted).  Mutual assent presents a question of fact, *M.J. Daly & Sons, Inc. v. City of West Haven*, 66 Conn.App. 41, 48, *cert. denied*, 258 Conn. 944 (2001), which may be based on "the parties' written or spoken words or by other acts." *See Precision Mechanical Services, Inc. v. Shelton Yacht & Cabana Club, Inc.*, 97 Conn.App. 258, 263, *cert. denied*, 280 Conn. 928 (2006).

Here, Defendants argue that the following three factors demonstrate the Schnabels' intent to be bound by the arbitration agreement at issue: (i) their agreement to the Membership Terms; (ii) continuing their Great Fun program membership after the Membership Terms were sent to them; and (iii) continuing to pay for the Great Fun program for an extended period.  Opening Brief at 20, 21.  However, as the District Court correctly found, none of these factors are sufficient to support an agreement to arbitrate.  Ruling at 7 (App. 9).  The District Court's determination should be affirmed.  Indeed, whether analyzed under Connecticut or

California law, the record here is clear that no contract of any kind was formed between the parties.

### 3. The Schnabels Never Assented To The Great Fun Program Membership Terms.

The District Court found that even if Defendants' "screen shots [App. 59-61] were substantially similar to the ones observed by [Plaintiffs,] ... none of these screen shots include the terms and conditions [Defendants] claim [Plaintiffs] are now bound by, nor do they make any mention of arbitration. ... Nowhere in this paragraph [App. 59] does Trilegiant mention arbitration or additional terms to follow." Ruling at 7-8 (App. 9-10). Thus, based on Defendants' deficient factual showing, the District Court properly concluded that the Schnabels "did nothing to manifest their assent to any additional terms and conditions that might be unilaterally imposed by Trilegiant." *Id.* at 8 (App. 10).[2]

Attempting to salvage their patently deficient showing below, Defendants now contend that, by virtue of a single "hyperlink" appearing on the screen shots,

---

[2]The District Court's conclusion is further buttressed by the Schnabels' uncontested evidence, which establishes that they were unaware that they were even dealing with Defendants and, instead, thought that they were still communicating with the retailers from whom they had made purchases. Edward Dec., ¶¶ 4, 6 (App. 69-70); Brian Dec., ¶¶ 9-10 (App. 77-78). Further, neither Edward nor Brian received any product or service from Defendants, or took advantage of the purported benefits of the membership programs into which they had allegedly enrolled. Edward Dec., ¶9 (App. 71); Brian Dec., ¶13 (App. 77).

the Schnabels were aware of the arbitration provision before they were even enrolled in the Great Fun program. Opening Brief at 10; App. 60, 64. But this is a newly-contrived argument that Defendants never presented to the District Court. Mallozzi Aff., ¶¶13, 15 (App. 55-56) (explaining that the Membership Terms, including the arbitration provision, are sent via email only *after* enrollment, and omitting any mention of a hyperlink); *see also* Ruling at 7, n.4 (App. 9) (noting that the Mallozzi Aff. did not even state that the Schnabels received the Membership Terms by regular mail). Defendants' new "hyperlink" argument should not be considered given the lack of evidentiary support for its existence in the record.

Even if the Court were to consider the argument, however, it provides no basis for concluding that the arbitration agreement is controlling, as courts have routinely declined to bind consumers to hidden or inconspicuous contractual terms. *See, e.g., Specht*, 306 F.3d at 35; *Hines v. Overstock.com, Inc.*, 668 F.Supp.2d 362, 367 (E.D.N.Y. 2009), *aff'd*, 380 Fed.Appx. 22 (2d Cir. 2010); *Van Tassell v. United Marketing Group, LLC*, No. 10 C 2675, 2011 WL 2632727, at *18 (N.D. Ill. July 5, 2011). This is particularly true in the context of arbitration terms, where courts steadfastly hold that, because arbitration supplants significant rights, the intention to arbitrate must be clear. *See, e.g., Dart Mechanical Corp. v.*

*XL Specialty Ins.*, 593 F.Supp.2d 464, 468 (E.D.N.Y. 2008) ("As dispute

resolution clauses require parties to sacrifice normal rights under the procedural

and substantive law, New York courts have generally required explicit and clear

expressions of intent to submit to alternative dispute resolution before giving full

effect to such clauses") (citation and internal quotations omitted).

Similarly, the Connecticut Supreme Court, in *L&R Realty v. Connecticut*

*National Bank*, 246 Conn. 1 (1998), identified several factors by which the

validity of jury trial waivers, which are "similar to arbitration agreements," can be

determined. *Id.* at 11.[3]  "[E]vidence that [a party] clearly did not intend to waive

the right to a jury trial" could "be apparent on the face of the agreement, such as

where the waiver is in particularly fine print or is buried in the middle of a

voluminous document." *Id.* at 16.  Indeed, this Court has held that "[a]rbitration

agreements are no exception to the requirement of manifestation of assent" and

---

[3]The *L&R* factors include: "(1) the conspicuousness of the waiver clause, including (a) its location relative to the signatures of the parties, (b) whether it was buried in the middle of a lengthy agreement, and (c) whether it was printed in a different typeface or font size than the remainder of the contract; (2) whether there was a substantial disparity in bargaining power between the parties to the agreement; (3) whether the party seeking to avoid enforcement was represented by counsel; (4) whether the opposing party had an opportunity to negotiate the terms of the agreement; and (5) whether the opposing party had been fraudulently induced into agreeing specifically to the jury trial waiver." *Id.*, 246 Conn. at 15 (citations omitted).

that, under California law, "[c]larity and conspicuousness of arbitration terms are important in securing informed assent." *Specht*, 306 F.3d at 30 (citation omitted). Clearly, Defendants' single hyperlink is a woefully deficient way of obtaining consumers' informed assent to be bound by an arbitration provision. *Id*. at 20, 31 (concluding that license terms, including an arbitration provision, that supposedly bound consumers who downloaded defendant's software, were not valid because they were located below the download button and therefore "did not carry an immediately visible notice of the existence of license terms or require unambiguous manifestation of assent to those terms"). This is particularly true where, as here, it is Plaintiffs' assertion that they never knowingly entered into the transactions at issue.

For example, in *Hines*, *supra*, where the plaintiff denied ever seeing the arbitration provision and a user was required to scroll down to the bottom of the web page to access the hyperlink that contained the arbitration clause, the district court concluded that there was no valid agreement to arbitrate. 668 F.Supp.2d at 365, 367. The same is true here -- Plaintiffs deny ever being aware of the arbitration provision and, even if the Membership Terms were available via a hyperlink, Defendants have not shown how or why Plaintiffs would have been on notice of these terms. Moreover, even if they became aware of the terms after they

supposedly contracted with Defendants, Plaintiffs' conduct -- by never using Defendants' products or services and being billed on a monthly basis (albeit surreptitiously) -- did not constitute acceptance. Ruling at 8-9 (App. 10-11).[4]

Defendants' unsupported argument that Plaintiffs must have received an arbitration agreement from Defendants via email, and that, under all of the circumstances, they are somehow bound to the terms of that agreement, is, in equal parts, incorrect and irrelevant. Although Edward admittedly received an email from Trilegiant that included an arbitration clause after closing out of the $20 rebate window (without any understanding whatsoever that an agreement had been consummated), he did not review it because he was unaware that it had any relevance to him. Thus, he had clearly not entered into any agreement with Defendants or "GF."

With respect to Brian, there is no evidence that he ever received any email

---

[4]As the District Court found, the decision in *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447 (7th Cir. 1996), is readily distinguishable. In that case, a software license agreement was "encoded on the CD–ROM disks as well as printed in the manual, and [] appear[ed] on a user's screen every time the software [ran]." *Id.* at 1450. Even though the transaction was such that "the exchange of money precede[d] the communication of detailed terms," it was upheld because, *inter alia*, the software could not be used unless and until the offeree was shown the license and manifested his assent. *Id.* at 1451–52. Here, as the District Court found, Plaintiffs "received no notice of the eventual receipt of additional terms and were never given the opportunity to 'reject' the email they eventually received." Ruling at 10 (App. 12).

from Defendants. Because Defendants cannot show that Plaintiffs ever intended to do business with Defendants, or that anything was ever mailed or emailed to Brian, their reliance on *Kurz v. Chase Manhattan Bank USA, N.A.*, 319 F.Supp.2d 457 (S.D.N.Y. 2004) and *Dzanoucakis v. Chase Manhattan Bank, USA*, No. 06-cv-5673 (JFB/ARL), 2009 WL 910691 (E.D.N.Y. Mar. 31, 2009), is misplaced. In *Kurz* and *Dzanoucakis*, the defendants, seeking to enforce the arbitration provisions, submitted business records or specific testimony that demonstrated that mailings were ***actually made*** to the plaintiffs. *See Kurz*, 319 F.Supp.2d at 464 (affidavit described message system that indicated that specific form in question was mailed on a specific date); *Dzanoucakis*, 2009 WL 910691, at *8 (declaration and computer records indicate mailings were made to plaintiff during specific dates).

Here, Defendants allege only that, "[a]ccording to Trilegiant's records maintained in the ordinary course of business, emails containing an electronic version of the 'Great Fun Membership Terms and Conditions' were sent to the email addresses provided by Edward and Brian." Mallozzi Aff., ¶ 14 (App. 56). Tellingly, however, Defendants did not submit any such emails to the District Court, choosing instead to submit an email apparently sent to ***their own employee***. (App. 66-68). This scant evidence does not support a presumption of receipt. In

fact, the cases relied upon by Defendants establish the deficiencies of their

argument.  In *American Boat Co., Inc. v. Unknown Sunken Barge*, 418 F.3d 910,

914 (8th Cir. 2005), the court found the presumption to be *insufficient* to establish

receipt and ordered an evidentiary hearing despite the fact that, unlike here, the

defendant submitted the actual email purportedly sent.  Likewise, *Laouini v. CLM

Freight Lines, Inc.*, 586 F.3d 473, 476 (7th Cir. 2009), simply cites to *American

Boat* and another case, *SSI Med. Servs., Inc. v. State Dep't of Human Servs.*, 685

A.2d 1 (N.J. 1996), which specifically holds that "[i]n order to establish proof that

electronic messages have been sent, courts may look, for example, to proof of

electronic mail return-receipt or to confirmation of downloading or printing."  *Id.*,

685 A.2d at 6, n.1.  Such evidence is glaringly, and tellingly, absent here.[5]

Of course, even if the receipt of the arbitration agreement were established,

receipt does not equate to consent to be bound by the terms of the agreement.  *See,

e.g., Olson v. The Bon, Inc.*, 144 Wash.App. 627, 639 (2008).  As the foregoing

indicates, there was no consent to be bound here.

_____

[5]Defendants reliance on *Oppenheimer & Co.*, for the argument that Plaintiffs
must provide evidence that no agreement exists, is misplaced.  First, there is
substantial evidence that no agreement exists, as the District Court recognized.
Secondly, the holding in *Oppenheimer* was dependent on the preliminary finding
that the party espousing arbitration had submitted evidence that an agreement, in
fact, existed.  *Id.*, 56 F.3d at 358.  Defendants have made no such showing here.

### 4. The Schnabels' Continued Membership In Great Fun And Payment Of Membership Fees Are Patently Insufficient To Show Assent To Be Bound By Any Arbitration Provision.

Defendants next argue that by not cancelling their Great Fun program membership *after* being sent a "welcome" email purportedly containing the Membership Terms and the disputed arbitration provision, and by continuing to pay their membership fees for months thereafter, the Schnabels manifested their intent to be bound by the disputed arbitration agreement. Defendants' arguments are factually and legally unpersuasive.

As explained above, whether a valid and binding contract has been formed under Connecticut or California law depends on whether there is a mutual understanding of terms that are definite and certain between the parties. *See Rosenblit v. Laschever*, 115 Conn.App. 282, 288 (2009); *Weddington Productions, Inc. v. Flick*, 60 Cal.App.4th 793, 811 (1998) ("If there is no evidence establishing a manifestation of assent to the 'same thing' by both parties, then there is no mutual consent to contract and no contract formation."). "In order for an enforceable contract to exist, the court must find that the parties' minds had truly met....If there has been a misunderstanding between the parties, or a misapprehension by one or both so that their minds have never met, no contract has been entered into by them and the court will not make for them a contract

which they themselves did not make." *See Electrical Wholesalers, Inc. v. M.J.B. Corp.*, 99 Conn.App. 294, 302 (2007) (internal quotation marks omitted); *see also Ubysz v. DiPietro*, 185 Conn. 47, 51 (1981) (in order to form a contract, there must be a bargain in which there is manifestation of mutual assent to the exchange between two or more parties).

The same analysis applies to arbitration contracts. "Arbitration is a creature of contract." *See Marinos v. Building Rehabilitations, LLC*, 67 Conn.App. 86, 88 (2001) (citation and internal quotations omitted). Therefore, "[t]he authority for arbitration must be derived from the agreement of the parties...." *Id.* (citation and internal quotations omitted). "[A] person can be compelled to arbitrate a dispute only if, to the extent that, and in the manner which, he has agreed to do so.... *No one can be forced to arbitrate a contract dispute who has not previously agreed to do so.*" *Id.* (citations and internal quotations omitted; emphasis added). "[T]he intent of the parties that arbitration be the exclusive method for the settlement of disputes arising under the contract must be *clearly manifested*. This *express intent* by both parties to enter into the arbitration agreement is essential to its existence." *See Harry Skolnick and Sons*, 7 Conn.App. at 179 (citation omitted; emphasis in original).

The Washington Court of Appeals addressed this issue in *Olson v. The Bon,*

-34-

*Inc.*, 144 Wash.App. 627 (2008), a case that involved the same defendant, Trilegiant, engaging in very similar sharp practices. Two years ago, the plaintiffs in *Olson* alleged that they were wrongfully billed by Trilegiant for enrollment in a credit protection program. Plaintiffs were solicited for a trial membership and cash back benefits which could be accepted by negotiating a check for $2.50. *Id.* at 630. Trilegiant alleged that it was its practice to mail a fulfillment kit to program members containing, *inter alia*, a mandatory arbitration provision *after* plaintiffs negotiated the checks. *Id.* at 632. There, as here, Trilegiant filed a motion to compel arbitration. *Id.* The trial court denied Trilegiant's motion, holding that it had failed to establish that the arbitration clause in the fulfillment kits became a part of the contract between the parties. *Id.*, 144 Wash.App. at 633. The Washington Court of Appeals affirmed the trial court's denial of Trilegiant's motion for several reasons, including unconscionability. In addition, the Court of Appeals found that, applying a similar "meeting of the minds" standard, even where Plaintiffs had cashed a check and entered into a business relationship with Trilegiant, there was "*no evidence that the Plaintiffs consented to be bound by an enforceable agreement to arbitrate and we cannot and should not force one upon them.*" *Id.* at 639 (emphasis added). The circumstances here are even more egregious.

Here, the record confirms that the Schnabels never manifested any intent to enter into any arbitration agreement with Defendants. In Edward's case, although he admits to receiving the "welcome" email from Defendants, *he never reviewed the email* because he was unaware that it had any relevance to him. (App. 70-71; ¶ 7). As for Brian, *he never received or saw a copy of the email*. (App. 78; ¶ 14). Common sense dictates that neither Edward nor Brian could have possibly assented to an arbitration agreement contained in an email that they never reviewed and, in Brian's case, never received. Neither Edward nor Brian were aware of any relationship with Defendants -- in the era of ever-present spam, anyone with an email account can easily imagine situations in which one receives, but does not open or review, an email from an unknown entity.

Contrary to Defendants' assertions, the "clear manifestation" standard cannot be satisfied merely because the Schnabels did not cancel the Great Fun program and continued to pay the membership fees. In fact, there is no evidence at all that the Schnabels knew that they were enrolled in the membership program in the first place, what the fees were for, or to whom they were being paid. As the Congressional investigation found, Defendants' use of such tactics "exploits shoppers' expectations about the online purchasing process to charge millions of consumers each year for services the consumers do not want and do not

understand they have purchased." (App. 18-19; ¶ 5). In Brian's case, he

continued to pay his membership fees without knowing he was paying Defendants

because it was charged to a credit card that he paid automatically and did not track

closely. (App. 76-77; ¶ 4). In addition, the amount of the charge was the same as

his Netflix charge, a recurring charge that he actually agreed to. (*Id.*) Edward

continued to pay for several months because the credit card that was charged was a

joint card and he believed that the charges had been incurred by his wife. (App.

70; ¶ 5). The tactics used by Defendants are designed to result in consumers, like

Plaintiffs, being charged for services they did not want and did not intend to

purchase. Defendants rely on consumers, like Plaintiffs, not realizing for some

time that they are being charged. A holding that consumers, by paying fees they

are being deceptively charged, are assenting to an agreement with parties such as

Defendants, would be essentially rewarding Defendants for being especially

effective in their deceit.

The decision in *Memberworks, Inc. v. Yance*, 899 So.2d 940 (Ala. 2004), on

which Defendants place particular emphasis, does not compel a different result.

As a preliminary matter, *Memberworks* is not only a non-binding, factually

distinguishable case, it is also, as the District Court recognized, a poorly reasoned

decision which unfairly places the burden for deceptive sales practices on

consumers. Ruling at 12 ( App. 14). In *Memberworks*, unlike here, the plaintiff was not challenging the existence of the underlying contract, but only that he was bound by an arbitration clause in a mutual agreement. *Id.* at 943. Further, the defendant presented evidence, in the form of a recorded telephone conversation, that the plaintiff had affirmatively agreed to be enrolled in the defendant's membership program. *Id.* at 941. In light of the established contract (and over a dissent that the District Court found more persuasive), the *Memberworks* court held that plaintiff's payment of the membership fees after receiving the arbitration agreement could be construed as consent to be bound by the arbitration agreement. *Id.* at 943-44. Here, in stark contrast, there is no evidence of any contract or valid business relationship between the parties. Moreover, as soon as the Schnabels became aware that they were being charged, they sought to obtain refunds, and they never received any benefits. *Memberworks* is factually inapposite and simply does not apply.

Despite these glaring factual differences, Defendants argue that, by rejecting the application of *Memberworks* to this case, the District Court committed factual and legal error. Defendants are wrong. They contend first that the District Court ignored their proffered evidence of assent to the arbitration agreement -- namely, that the Schnabels did not cancel the Great Fun program and continued to pay the

membership fees after purportedly receiving Defendants' "welcome" email. However, as discussed above, these facts are patently insufficient to demonstrate clear and express assent to the arbitration agreement, particularly when the Schnabels never saw the email containing the arbitration agreement, did not know they had been enrolled in the Great Fun program, and did not know why and to whom the fees were being paid.

Next, Defendants contend that the District Court improperly adopted the dissent's reasoning in *Memberworks*, claiming that such reasoning goes against other decisions which hold that consumers are bound by arbitration agreements sent to them after the fact. But these "other" decisions are entirely unhelpful to Defendants, because they involved either a continuing, valid business relationship, or the consumer's acceptance of benefits under the contract, or both -- none of which is present here. *See Kurz*, 319 F.Supp.2d at 465 (where there was a valid credit card agreement, court concluded that "plaintiff agreed to the arbitration amendment because use of the credit card account continued through July 31, 2002, several months after the opt-out deadline passed"); *Walters v. Chase Manhattan Bank*, CV-07-0037-FVS, 2008 WL 3200739, at *3 (E.D. Wash. Aug. 6, 2008) (same); *Milligan v. Comcast Corp.*, No. 06-cv-00809-UWC, 2007 WL 4885492, at *2 (N.D. Ala. Jan. 22, 2007) (existence of valid contract for cable

services and continued use of cable services after receipt of arbitration agreement); *Bank One, N.A. v. Coates*, 125 F.Supp.2d 819, 825 (S.D.Miss. 2001), *aff'd*, 34 Fed.Appx. 964 (5th Cir. 2002) (existence of a valid "Credit Application and Security Agreement," which defendant executed in connection with his purchase and financing of a satellite dish system); *Hardy v. Cendant Corp.*, No. 04-15403 (11th Cir. Aug. 3, 2005) (unpublished) (App. 79-80) (existence of a valid membership contract with defendant because plaintiffs "accepted" the three-month trial period).[6] In contrast to these cases, the Schnabels did not have a valid business relationship with Defendants **and** the Schnabels did not accept any benefits under any purported contract, either before or after the supposed receipt of the "welcome" email containing the arbitration agreement. As a result, even under the cases cited by Defendants, the Schnabels cannot be found to have assented to be bound by the arbitration agreement.

Defendants' last arguments also provide no basis to compel arbitration. Specifically, they take issue with the District Court's finding that the Schnabels never accepted any benefit from Defendants, suggesting that this factor is irrelevant to determining whether there was manifestation of assent to the

---

[6]Besides being factually inapplicable, *Hardy* is an unpublished, non-binding, single paragraph decision by the Eleventh Circuit, which provides no legal support for Defendants' position.

arbitration agreement. This argument is both disingenuous and internally inconsistent, since, as they put it, "[t]he contract formation standard here is what a reasonable person would conclude *based on Edward and Brian's conduct*." Opening Brief at 34 (emphasis added). Thus, by Defendants' own standard, whether or not the Schnabels used and accepted the membership benefits constitutes conduct that is absolutely relevant to the contract formation issue.

Finally, Defendants argue unconvincingly that the Schnabels were in fact given an opportunity to reject the arbitration agreement because they were supposedly told during the enrollment process and in the post-enrollment "welcome" email (assuming *arguendo* it was received) that they could cancel the Great Fun program during the trial period. But this argument also fails because the record is abundantly clear that the arbitration agreement was not part of the initial membership agreement (App. 59-61), Defendants did not properly disclose its existence to the Schnabels, and the Schnabels did not expressly assent to be bound by it. Under these circumstances, it is pure fiction for Defendants to assert that the Schnabels could have rejected the arbitration agreement.

5. **Whether The Membership Terms Were Provided Before Or After Enrollment Is Inconsequential To The Existence Of A Valid Arbitration Agreement.**

Defendants further attack the District Court's decision, repeating the same

argument that by virtue of the "Term and Conditions" hyperlink and a "Yes" button purportedly clicked on by the Schnabels, the District Court should have concluded that Defendants provided the Membership Terms to Plaintiffs *before* they were enrolled. As explained above, this argument fails because it was not properly presented below and because it contradicts the well-settled law of this Circuit rejecting hidden or inconspicuous contractual terms. *Specht*, 306 F.3d at 32 ("[W]here consumers are urged to download free software at the immediate click of a button, a reference to the existence of license terms on a submerged screen is not sufficient to place consumers on inquiry or constructive notice of those terms") (footnote omitted).

Moreover, this argument is a blatant red-herring, as it has nothing to with the principal issue of assent to the arbitration agreement. Indeed, the District Court aptly considered and rejected this very argument on the grounds that the Membership Terms, including the arbitration agreement, were not part of the agreement allegedly entered into:

> Even assuming Edward and Brian read all of this information and
> entered their identifying information as alleged, the contract they
> formed with Trilegiant did not include an arbitration clause. Instead,
> any contract that could have formed would have included terms
> exactly as Trilegiant proposed them in their prompts – a monthly
> charge in exchange for online savings. By agreeing to these terms,
> Edward and Brian did nothing to manifest their assent to any

additional terms and conditions that might be unilaterally imposed by Trilegiant.

Ruling at 8 (App. 10) (citation omitted).  As Defendants have failed to offer any evidence whatsoever demonstrating that the terms and conditions included the arbitration clause, this ground for appeal is pointless, irrelevant in its entirety and should not be considered.[7]

## II.     LUCY SCHNABEL'S CLAIMS ARE NOT SUBJECT TO ARBITRATION

Citing principles of estoppel, Defendants argue that because Lucy's claims are derivative of Edward's, she must arbitrate her claims, even though they concede that she neither enrolled in the Great Fun program nor received an

---

[7]For this reason, none of the cases cited by Defendants -- *Scherillo v. Dun & Bradstreet, Inc.*, 684 F.Supp.2d 313 (E.D.N.Y. 2010), *Novak v. Overture Svcs., Inc.*, 309 F.Supp.2d 446 (E.D.N.Y. 2004), and *Burcham v. Expedia, Inc.*, No. 07-cv-1963 CDP, 2009 WL 586513 (E.D. Mo. Mar. 6, 2009) -- are helpful, since those cases did not involve undisclosed terms, which is the situation here.  In addition, Defendants attempt to distinguish this Court's decision in *Specht* is unpersuasive.  Here, the District Court relied on *Specht* for the proposition that, in order to impose additional terms, such as an arbitration clause, adequate notice to the consumer of these terms must be provided.  Ruling at 8-9 (App. 10-11).  But rather than address this point, Defendants merely state that, in contrast to the plaintiffs in *Specht* who "were not on notice that *any* terms and conditions applied to the product at the time of purchase," the Schnabels were notified of the Membership Terms by virtue of the single, insufficient hyperlink.  Opening Brief at 38.  Defendants do not argue that the Schnabels were properly on notice of the *arbitration clause* -- nor can they based on the record.  Thus, Defendants' attempt to discredit the District Court based upon its reliance on *Specht* misses the mark and fails.

arbitration provision.  Plaintiffs do not agree that Lucy's claims are subject to arbitration.  Specifically, because Edward's claims are not suitable for arbitration for the reasons set forth herein, neither are Lucy's.

## III.  PLAINTIFFS' CLAIMS AGAINST AFFINION ARE NOT SUBJECT TO ARBITRATION

Implicitly conceding the "tight relatedness of the parties...and controversies," Defendants urge the Court to find Affinion subject to arbitration because, they claim, the causes of action against Trilegiant are arbitrable.  Opening Brief at 41-43 (citations and internal quotations omitted).  Citing decisions in which courts have upheld arbitration against a parent company, Defendants argue that Affinion and Trilegiant should be treated as a "a single unit."  *Id*. (citations and internal quotations omitted).  First, as set forth above, Defendants cannot even establish that the Membership Terms mandates claims against Trilegiant, as opposed to "GF," to be arbitrated.  Second, even if Trilegiant were a party to the arbitration clause -- something Plaintiffs do not assert, even though they are asserting in this action that Trilegiant and Affinion are one and the same -- there was no meeting of the minds as to a business transaction, let alone its arbitration.  Regardless, Plaintiffs concur that Affinion and Trilegiant are alter egos and should be treated as a single unit by this Court, but as set forth above,

because the claims against Trilegiant are not subject to arbitration, neither are the claims against Affinion.

## IV. THERE IS NO EVIDENCE THAT THE PARTIES AGREED TO AUTHORIZE ARBITRATION AT ALL, LET ALONE CLASSWIDE ARBITRATION

Citing the Supreme Court's recent decision in *AT&T Mobility LLC v. Concepcion*, 131 S.Ct. 1740 (2011) ("*Concepcion*"), Plaintiffs argue that Defendants should be required to proceed in arbitration on an individual, rather than classwide, basis. Opening Brief at 43-44. *Concepcion* stands for the general (and in this case, irrelevant) principle that rules classifying "most collective-arbitration waivers in consumer contracts as unconscionable" violate the FAA. *Id.* at 1746. *Concepcion* also explicitly recognizes the "fundamental principle that arbitration is a matter of contract." *Id.* at 1745 (citation omitted). Further, *Concepcion* explicitly holds that the FAA's Section 2 saving clause "permits agreements to be invalidated by 'generally applicable contract defenses.'" *Id.* at 1746 (citation omitted).

What Defendants intentionally ignore, of course, is that *Concepcion* is premised on the fact that the parties in that action had actually entered into an agreement with one another. *Id.* at 1744. In stark contrast, here, as discussed above and as recognized by the District Court, the parties never entered into an

agreement on arbitration.  As a result, the Schnabels are not required to proceed in arbitration, let alone in "individual, non-class arbitration" and *Concepcion* is of no moment.

## CONCLUSION

For the foregoing reasons, this Court should affirm the District Court's denial of Defendants' Motion to Dismiss or Stay and Compel Arbitration.

Respectfully submitted,

  /s/ Patrick A. Klingman
James E. Miller
Patrick A. Klingman
Karen M. Leser-Grenon
SHEPHERD, FINKELMAN, MILLER  & SHAH, LLP
65 Main Street
Chester, CT 06412
Telephone:  (860) 526-1100
Facsimile:  (860) 526-1120
Email:      jmiller@sfmslaw.com
             pklingman@sfmslaw.com
             kleser@sfmslaw.com

David A. Burkhalter, II
BURKHALTER, RAYSON & ASSOCIATES, P.C.
P.O. Box 2777
Knoxville, TN 37901
Telephone:  (865) 524-4974
Facsimile:  (865) 524-0172
Email:      david@burkhalterrayson.com

James C. Shah
Nathan C. Zipperian
SHEPHERD, FINKELMAN, MILLER & SHAH, LLP
35 East State Street
Media, PA 19063
Telephone:  (610) 891-9880
Facsimile:  (610) 891-9883
Email:        jshah@sfmslaw.com
                   nzipperian@sfmslaw.com

Rose F. Luzon
SHEPHERD, FINKELMAN, MILLER & SHAH, LLP
401 West A Street, Suite 2350
San Diego, CA  92101
Telephone:  (619) 235-2416
Facsimile:  (619) 234-7334
Email:        rluzon@sfmslaw.com

***Attorneys for Plaintiffs and the Proposed Class***

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 9515 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Word Perfect Legal Mode in 14-point Times New Roman type.

/s/ Patrick A. Klingman
Patrick A. Klingman

# CERTIFICATE OF SERVICE

I, Patrick A. Klingman, hereby certify that this brief has been

electronically-filed via the Court's ECF system, which will send an electronic

copy to the following ECF-registered counsel of record:

James H. Bicks
Wiggin & Dana, LLP
Two Stamford Plaza
281 Tresser Boulevard
Stamford, Connecticut 06901
jbicks@wiggin.com
tclauss@wiggin.com

Kenneth M. Kliebard
Gregory T. Fouts
Morgan, Lewis & Bockius LLP
77 West Wacker Drive
Chicago, IL 60601-5094
kkliebard@morganlewis.com
gfouts@morganlewis.com

I further certify that there are no non-ECF registered counsel of record for

Appellants-Defendants to whom copies of this brief need to be sent via U.S. mail.

This 22nd day of July, 2011.

/s/ Patrick A. Klingman
Patrick A. Klingman